Filed 4/9/13  Wedbush Securities v. Kelleher CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| WEDBUSH SECURITIES, INC.,<br><br>　　　　Plaintiff  and Appellant,<br><br>v.<br><br>STEPHEN KELLEHER,<br><br>　　　　Defendant and Respondent. | A133204<br><br>(San Francisco City & County<br>Super. Ct. No. CPF-11511465) |

**I.**

**INTRODUCTION**

Appellant Wedbush Securities, Inc. (Wedbush) appeals from contemporaneous trial court orders denying its motion to vacate an arbitration award and granting respondent Stephen Kelleher's (Kelleher) motion to confirm the award.  Wedbush contends the trial court erred in its rulings because: (1) the arbitrators erred in denying Wedbush's motion to postpone the arbitration hearing; (2) the arbitrators improperly refused to hear evidence material to the controversy proffered by Wedbush at the arbitration; and (3) one of the three arbitrators failed to make a legally required disclosure subjecting him to disqualification.

We disagree, and affirm.

1

## PROCEDURAL AND FACTUAL BACKGROUNDS

### A. General Background Facts and Claims Asserted by Kelleher Against Wedbush in Arbitration[1]

Kelleher is an experienced municipal bond trader who started in the securities industry in 1984. He went to work for Wedbush as the head of its tax-exempt sales and trading desk on January 18, 2007. As is material here, Kelleher's employment agreement contained five provisions relating to his compensation. He was to receive:

1. An annual base salary of $125,000.00;

2. Incentive pay for the first two years of $175,000.00, each year;

3. Thirty-five percent of trading profits and ten percent commission revenues, less the base salary, to be paid annually;

4. Participation in a monthly incentive pool "comprised of 10% of net income when profit margins are less than 10%, and 20% of net income when profit margins are greater than 10%, but less than 20%. Additionally, when profit margins are greater than 20%, the calculation will be based on 25% of net income"; and,

5. To "be considered for eligibility to receive an incentive stock option of 5,000 shares of Wedbush" at the end of the first year of employment.

During his first six months with Wedbush, Kelleher's department generated $4 million in revenue and $700,000 in profits. In fiscal year 2008, his department generated $6.8 million in revenue and $4.75 million in profit. In fiscal year 2009, $9.1 million in revenue and $7.8 million in profit were produced; and in the period from July 1 through December 31, 2009, $4.2 million in revenue and $3.5 million in profit were produced. Overall, in approximately three years, revenues of more than $24 million and profit of $16.75 million were generated by Kelleher's department.

During those years, the only component of compensation consistently paid to Kelleher was his base salary. Based on the compensation formulae contained in the

---

[1] These general facts are taken from Kelleher's "Statement of Claim," which was attached to Wedbush's "Petition to Vacate Arbitration Award," filed in the trial court.

employment contract, and subtracting those partial payments concededly made to him, Kelleher claimed that he was owed in excess of $6,177,181.00.

## B. The Arbitration Proceedings and Award

In April 2010, Kelleher filed a "Statement of Claim" (SOC) with the Financial Industry Regulatory Authority (FINRA), the designated adjudicator of any dispute between Kelleher and Wedbush concerning his compensation. The SOC outlined the basic facts relating to Kelleher's claim for unpaid compensation, and sought more than $6 million against Wedbush.[2] The claim alleged causes of action for breach of contract, violation of Labor Code sections 210 and 206, fraud, and unfair business practices under Business and Professions Code section 17200 et seq. In addition to compensatory damages, the SOC sought punitive damages.

A "Statement of Answer" (SOA) was thereafter filed by Wedbush denying the allegations in the SOC. In essence, Wedbush denied owing Kelleher any further compensation, and noted that it had paid him a total of almost $5 million, including an amount that was to be paid in the then-current fiscal year. The SOA detailed what amounts had been paid for each component of compensation set forth in the employment agreement, and when those payments had been made. The SOA also included a request for a more definite statement by Kelleher concerning the factual bases for his claims against Edward W. Wedbush, individually, or that these claims be dismissed.

The only criticism of Kelleher's performance referenced in the SOA concerned his lack of success in recruiting and retaining qualified sales personnel, and his failure to report certain matters to FINRA, which caused "regulatory issues" for Wedbush.

On this last issue, the SOA stated:

"Quite recently, Wedbush was cited for the following: 1) failing to report the correct Time of Trade to the Real-Time Transaction Reporting System ('RTRS') in a

---

[2] The SOC sought recovery against both Wedbush and its chief executive officer, Edward W. Wedbush, individually. We have used the name "Wedbush" collectively. We note, however, that during the arbitration proceedings Kelleher agreed to dismiss the claims against Mr. Wedbush.

multitude of reports for transactions generated from municipal department and 2) failing to report information regarding the numerous purchases and sales transactions effected in municipal securities to the RTRS. (Please see Exhibit 2[.]) Both of the infractions Wedbush was cited for came directly out of Kelleher's department, and arguably, were caused by Kelleher's actions. Fortunately, the company was able to resolve the enforcement issue by negotiating a financial settlement with . . . [FINRA] and move beyond that challenge."[3]

On September 23, 2010, Kelleher filed an "Amendment to Statement of Claim" (amended SOA) with FINRA updating the claim information with modified calculations based on payments received by Kelleher from Wedbush since the original SOA had been filed. The amended SOA also reported on communications which had taken place between the parties since April 2010 concerning the compensation claim.

A prehearing conference was held on November 1, 2010, and the arbitration hearing was conducted before a three-person arbitration panel (Panel) on May 18-20, 2011. At the commencement of the hearing on May 18, Kelleher made an oral motion to exclude any evidence not disclosed by Wedbush more than 20 days before the hearing commencement date, pursuant to Rule 13514 of FINRA's Code of Arbitration Procedure for Industry Disputes (FINRA rules). He also moved to exclude any such evidence as an issue preclusion sanction for Wedbush's noncompliance with two extant discovery orders. Wedbush, in turn, made a motion to postpone the hearing.[4] The three motions related to late-produced documents by Wedbush, and the proffer of an expanded witness list, concerning an ongoing 12-month investigation of trading activities involving

---

[3] Exhibit 2 is a "Letter of Acceptance, Waiver and Consent" between Wedbush and FINRA relating to these regulatory issues signed on July 14, 2010. In it Wedbush agreed, inter alia, to pay a fine of $24,000.00 relating to alleged violations of Municipal Securities Rulemaking Board (MSRB) Rule G-14, and a monetary sanction of $15,000.00 for the same violations.

[4] Although the matter was heard and decided on the first day of the arbitration hearing (May 18), the written motion is dated May 19, 2011.

Kelleher or his department that Wedbush felt could trigger reporting requirements to MSRB and FINRA.

The Panel heard from counsel concerning these matters and then ruled that Wedbush would be limited to evidence only relating to matters pled in its SOA, which did not raise these possible trading irregularities, and it also denied the motion to postpone the hearing. At the same time, the Panel granted Kelleher's motion to exclude the evidence.

Appearing as witnesses over the course of the three-day arbitration were Wedbush's former chairman of the board Jack Luikart, Edward W. Wedbush, and Edward's son and current chief executive officer Gary Wedbush. Certain documentary evidence was also reviewed by the Panel.

On June 22 and 23, the Panel signed the award. It awarded Kelleher $3.5 million in compensation the Panel found was owed because of Wedbush's "morally reprehensible failure and refusal to compensate" Kelleher in a timely fashion. The Panel also awarded Kelleher the vested option to purchase 3,750 shares of Wedbush at a "strike price" of $20.00 per share, and an additional vested option to purchase 375 shares at a strike price of $26.00 per share. Other fees, expenses, and costs relating to the arbitration were allocated to the respective parties.[5]

### C. Procedural History of Proceedings in the Trial Court

On July 22, 2011,[6] Wedbush filed a petition to vacate the arbitration award and supporting documents in the San Francisco Superior Court. Six days later, on July 28, Kelleher filed a cross-petition to confirm the arbitration award, with supporting papers. Both petitions were re-filed and re-noticed for hearing. Wedbush asserted the same three grounds in support of its motion to vacate as it does on appeal: (1) error by the Panel in denying Wedbush's request to postpone the arbitration hearing; (2) error by the Panel in excluding Wedbush's late proffered evidence concerning the company's investigation

---

[5] None of these findings are challenged on appeal by Wedbush.

[6] All further dates are in the calendar year 2011, unless otherwise indicated.

5

into possible regulatory irregularities by Kelleher and/or his department; and (3) the failure by one of the arbitrators, Hitchcock, to disclose a ground for his disqualification.

Thereafter, Kelleher filed an opposition to Wedbush's petition to vacate the award, and lodged hearsay objections to certain of Wedbush's assertions in support of its petition. Wedbush responded to these objections, and filed two separate requests for judicial notice.

A tentative ruling on the motions was filed by the trial court prior to the hearing date. In it, the court tentatively granted Kelleher's petition to confirm the arbitration award, and denied Wedbush's petition to vacate the award. As to Wedbush's petition, the court found that the Panel did not abuse its discretion or exceed its authority by denying Wedbush's request for a hearing postponement, and found that Wedbush had failed to show good cause warranting a postponement. Also, the trial court concluded that there was no good cause shown requiring the Panel to admit the proffered evidence concerning Kelleher's possible trading irregularities, which evidence Wedbush had failed to disclose more than 20 days before the arbitration date, in conformance with FINRA Rule 13514. Lastly, the court found no basis for the disqualification of Arbitrator Hitchcock. Kelleher was awarded the full amount of the arbitration award plus legal interest from that date.

After hearing from counsel on September 7, the trial court adopted the tentative ruling in its final order. In addition to the grounds stated in the tentative ruling, the trial court added that Wedbush had not satisfied its burden of showing that the evidence of its investigation of Kelleher and his department was relevant to the issues involved in the arbitration. This appeal followed.

## III.

## DISCUSSION

### A.  Issues Raised on Appeal and the Applicable Standards of Review

We review de novo a trial court's judgment confirming an arbitration award. (*Advanced Micro Devices, Inc. v. Intel Corp*. (1994) 9 Cal.4th 362, 376, fn. 9.)  Courts cannot, however, review the award itself "for errors of fact or law."  (*Moncharsh v. Heily*

6

*& Blase* (1992) 3 Cal.4th 1, 11 (*Moncharsh*).)  This means that judicial review of a petition to vacate an award in both the trial court and on appeal is limited to the statutory grounds found in Code of Civil Procedure section 1286.2.  (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 981-982.)

The reason for such limited judicial review is that an "arbitration decision is final and conclusive because the parties have agreed that it be so."  (*Moncharsh*, *supra*, 3 Cal.4th at p. 10.)  Arbitration by agreement is often a "process in which parties voluntarily trade the safeguards and formalities of court litigation for an expeditious, sometimes roughshod means of resolving their dispute."  (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 831 (*Vandenberg*).)  Because "arbitral finality is a core component of the parties' agreement to submit to arbitration" (*Moncharsh*, at p. 10), and because arbitrators are not required to make decisions according to the rule of law, parties to an arbitration agreement accept the risk of arbitrator errors (*id*. at p. 12), and arbitrator decisions cannot be judicially reviewed for errors of fact or law even if the error is apparent and causes substantial injustice (*id*. at pp. 11, 33; see *Vandenberg*, at p. 832).  " 'As a consequence, arbitration awards are generally immune from judicial review.' " (*Moncharsh*, at p. 11.)

Therefore, the authority of the courts to vacate an arbitration award is limited by statute.  Courts may vacate an award only when: (1) the award was procured by corruption, fraud, or other undue means; (2) an arbitrator was corrupt; (3) misconduct of the arbitrator substantially prejudiced a party's rights; (4) the arbitrator exceeded his or her powers; (5) an arbitrator's refusal to postpone the hearing or hear material evidence substantially prejudiced the rights of a party; or (6) an arbitrator failed to disclose a ground for disqualification or improperly failed to disqualify himself or herself.  (Code Civ. Proc., § 1286.2, subd. (a).)

As noted, Wedbush has raised three separate grounds for vacating the arbitration award.  The Panel's denial of Wedbush's request to postpone the hearing is reviewable (Code Civ. Proc., § 1286.2, subd. (a)(5)), as is the allegation that one of the arbitrators failed to make a required disclosure (*id*. at subd. (a)(6)(A)); *Mahnke v. Superior Court*

7

(2009) 180 Cal.App.4th 565, 579-580.) However, "[c]ourts have repeatedly instructed litigants that challenges to the arbitrator's rulings on discovery, admission of evidence, reasoning, and conduct of the proceedings do not lie. [Citations.]" (*Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 167.) Therefore, Wedbush's contention that the Panel wrongfully refused to "hear evidence of one of [its] primary defenses" by preventing it from introducing evidence concerning the investigation as to Kelleher's trading practices is not an acceptable basis for appeal.

**B. No Error in Denying Wedbush's Motion for a Hearing Postponement**

In its moving papers presented to the Panel, Wedbush made a request that the hearing be postponed to an unspecified future date. It acknowledged that the motion could not be granted under FINRA Rule 13601(a)(2), unless the Panel determined that good cause existed for the postponement because the motion was being made within 10 days of the hearing. Nevertheless, Wedbush asserted that good cause existed:

"During the past week or so, Wedbush executive management has consulted with its Business Conduct unit regarding their findings in investigating the trading activities managed by [respondent] Stephen Kelleher ('Kelleher'), specifically in regards to new issue municipal securities and the syndicate distribution of those securities.

"The investigation has covered a 3[-]year period of time and approximately 40 new issues offerings in California where Wedbush was the senior manager and acted as the syndicate manager.

"The investigation is ongoing and not yet completed, however, the analysis to date suggest that possibly Kelleher and the firm may have potential exposure to [MSRB] Rules G17, G30, and G11 that govern fair practice principles in the new issue municipal and the municipal market in general.

"Wedbush's investigation is not conclusive but if the firm concludes after it completes its investigation that the firm and/or Kelleher has acted in violation of said rules, the firm will be required to report the findings to the MSRB and FINRA.

"Based on the foregoing, [Wedbush] believe[s] good cause exists to briefly postpone the hearing particularly where it may be found that the activities discussed have

8

occurred. Clearly, if it is determined the activities discussed have taken place, the firm will have a reporting requirement to both MSRB and FINRA, and both parties could be subject to fines, censures, and sanctions, and Kelleher could be subject to termination by Wedbush."

"[W]hen, as here, an arbitrator exercises discretion in denying a continuance request, there are two issues to be resolved . . . . First, the trial court must determine whether the arbitrator abused his or her discretion by refusing to postpone the hearing upon sufficient cause being shown. Second, if there was an abuse of discretion, the trial court must determine whether the moving party suffered substantial prejudice as a result." (*SWAB Financial, LLC v. E\*Trade Securities, LLC* (2007) 150 Cal.App.4th 1181, 1198 (*SWAB Financial*).) "Only if the arbitrators abused their discretion and there was resulting prejudice could the trial court properly vacate the arbitration award." (*Ibid.*)

In order to conclude an arbitration panel abused its discretion, we must determine whether the denial of a request for a postponement exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the arbitrators. (See *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.)

As to the first prong, there is ample justification for the Panel's denial of Wedbush's request for a postponement. As noted above, the so-called investigation was conducted by Wedbush's "Business Conduct" unit, took place over at least a 12-month period, and covered several years of trading activity. Nevertheless, Wedbush contended that the firm's "executive management" was contacted by the Business Conduct unit just a week or so before the arbitration hearing. Wedbush failed to explain to the Panel how it was that its internal investigating body came to be engaged in an extensive investigation

9

of one of its division's trading practices for which the firm might be liable for discipline without senior management knowing about it.**⁷**

Furthermore, although the firm clearly knew about the investigation in mid-2010, and "executive management" knew for at least a week before the arbitration, no notice apparently was given to Kelleher's lawyers about the issue Wedbush wanted to present at the hearing, and no attempt was made until the day before the arbitration hearing was convened to seek a continuance. Arbitrators have been found not to have abused their discretion in refusing a party's request to postpone the arbitration when the continuance request was made under similar circumstances. (See, e.g., *SWAB Financial*, *supra*, 150 Cal.App.4th at p. 1199; *Outdoor Services, Inc. v. Pabagold, Inc*. (1986) 185 Cal.App.3d 676, 686 [affirming arbitrator refusal to grant continuance where motion was made on first day of hearings, yet evidence predated arbitration by several months]; *Roitz v. Coldwell Banker Residential Brokerage Co*. (1998) 62 Cal.App.4th 716, 725 [continuance request made five days before hearing to subpoena witnesses was "highly questionable" where appellant had delayed issuing subpoenas]; *Laws v. Morgan Stanley Dean Witter* (5th Cir. 2006) 452 F.3d 398, 400-401 [party to arbitration who moved for a continuance on the day before arbitration hearing was not denied a fair hearing].)

As if this were not sufficient to merit denial of the postponement request, the proffer made to the Panel was little more than speculation, both as it related to the irregularities themselves, and Kelleher's involvement in them:

"The investigation is ongoing and not yet completed, however, the analysis to date suggest *that possibly* Kelleher and the firm *may have* potential exposure [MSRB] Rules G17, G30, and G11 that govern fair practice principles in the new issue municipal and the municipal market in general.

---

**⁷** Casting further doubt on the credibility of Wedbush's explanation concerning these events, it alleges in its brief on appeal that this investigation actually was disclosed in its SOA when it pointed out that certain trading activities had caused Wedbush "regulatory issues for the company." As we have explained earlier, this reference in Wedbush's SOA related to an entirely separate issue unrelated to its so-called ongoing investigation; an earlier matter that was settled with the regulatory authorities.

10

"Wedbush's investigation is not conclusive *but if* the firm concludes after it completes its investigation *that the firm and/or Kelleher* has acted in violation of said rules, the firm will be required to report the findings to the MSRB and FINRA." (Italics added.)

This showing itself was tentative, and speculative enough to warrant denial of the postponement request.[8]

Lastly on this issue, we agree with the Panel and the trial court that Wedbush failed to make an adequate showing at the time its motion for a postponement was made that the investigation was relevant to Kelleher's claim of compensation. That claim was based on the contract between the parties and, on its face is determined simply by applying arithmetic formulae to the revenue and profits produced by Kelleher:

1. An annual base salary of $125,000.00;

2. Incentive pay for the first two years of $175,000.00, each year;

3. Thirty-five percent of trading profits and ten percent commission revenues, less the base salary, to be paid annually;

4. Participation in a monthly incentive pool "comprised of 10% of net income when profit margins are less than 10%, and 20% of net income when profit margins are greater than 10%, but less than 20%. Additionally, when profit margins are greater than 20%, the calculation will be based on 25% of net income"; and,

5. To "be considered for eligibility to receive an incentive stock option of 5,000 shares of Wedbush" at the end of the first year of employment.

Wedbush has failed to make a convincing argument on appeal that any matter involved in its investigation had any bearing on Kelleher's entitlement to compensation. To be sure, if the investigation concludes that Kelleher is responsible for "trading

---

[8] This conclusion is also justified by Wedbush's representation made after the arbitration was concluded that the investigation had been ongoing for at least one year. Given its duration, one would expect the firm, which claimed it was exposed to regulatory sanctions for irregular trading activities, to have reached the point of some certainty.

11

irregularities," and if Wedbush is subject to regulatory sanctions as a result, then at some point it may have a claim against Kelleher for indemnity. But, Wedbush's explanation of the connection between the investigation and Kelleher's claim for compensation was itself inadequate to support a postponement, let alone support its contention that the Panel abused its discretion in denying the request.

## C. No Error in Precluding the Admission of Evidence of Alleged Trading Irregularities at the Arbitration Hearing

In addition to denying Wedbush's request to continue the hearing, the Panel also refused to admit Wedbush's evidence concerning its ongoing investigation into Kelleher's trading practices, proffered on the morning of the first day of the arbitration. The Panel excluded the proffered evidence on three separate grounds: (1) as a discovery sanction for Wedbush's violation of two separate orders concerning discovery; (2) because the evidence was not disclosed more than 20 days before the arbitration commenced in violation of FINRA rules; and (3) because the issue was not raised in Wedbush's SOA, and thus the evidence was irrelevant to its defenses as pleaded.

As Wedbush acknowledges on appeal, the Panel's final award reflects that it imposed an issue preclusion sanction for Wedbush's persistent failure to comply with discovery orders requiring it to disclose and explain the basis for its damages calculations. Code of Civil Procedure section 1283.05, subdivision (c) grants arbitrators the power to issue discovery orders imposing "terms, conditions, consequences, liabilities, sanctions, and penalties," and it states that "such orders shall be as conclusive, final, and enforceable as an arbitration award on the merits, if the making of any such order that is equivalent to an award or correction of an award is subject to the same conditions, if any, as are applicable to the making of an award or correction of an award."

Not only does Code of Civil Procedure section 1283.05, subdivision (c) vest authority in arbitrators to impose discovery sanctions, but FINRA rules applicable to the parties' dispute, also include a right to impose discovery sanctions. FINRA Rule 13511 provided:

"13511. Discovery Sanctions

"(a) Failure to cooperate in the exchange of documents and information as required under the Code may result in sanctions. The panel may issue sanctions against any party in accordance with Rule 13212(a) for:

"Failing to comply with the discovery provisions of the Code, unless the panel determines that there is substantial justification for the failure to comply; or

"Frivolously objecting to the production of requested documents or information.

"(b) The panel may dismiss a claim, defense or proceeding with prejudice in accordance with Rule 13212(c) for intentional and material failure to comply with a discovery order of the panel if prior warnings or sanctions have proven ineffective."

Wedbush makes no argument in its appellate brief[9] that either the trial court or this court has the authority to review the imposition of arbitration discovery sanctions, and if so, that the Panel in this case abused its discretion in precluding Wedbush from introducing evidence of its newly disclosed, ongoing investigation of Kelleher. To the contrary, as *Alexander v. Blue Cross of California* (2001) 88 Cal.App.4th 1082 (*Alexander*) makes clear, the evidence preclusion ordered here as a discovery sanction is not reviewable.

In *Alexander*, *supra*, 88 Cal.App.4th 1082, a plaintiff complained that an arbitrator exceeded his authority by failing to impose discovery sanctions that she believed were mandated by statute. (*Id*. at pp. 1086-1087.) Citing California Supreme Court decisions, the court reiterated that an arbitrator does not exceed his or her powers merely by rendering an erroneous decision on a legal or factual issue if the issue was within the scope of the controversy submitted for arbitration. (*Id*. at p. 1089.) The *Alexander* court unequivocally held that once the issue of discovery is submitted to an arbitrator, a party cannot subsequently contend that the arbitrator exceeded his or her powers even if the

---

[9] The issues of whether courts have the authority to review the Panel's imposition of discovery sanctions, and if so, whether the Panel here abused its discretion in imposing sanctions, are addressed in Kelleher's brief, but Wedbush has failed to respond to these arguments.

13

arbitrator incorrectly decided the discovery issue. (*Ibid.*) "A different conclusion would unduly extend the scope of judicial review of arbitration proceedings." (*Id.* at pp. 1089-1090.)

Additionally, Wedbush attacks the alternative ground relied on by the Panel to exclude the evidence because Wedbush failed to disclose it in a timely fashion. In connection with this alternative reason, we note that FINRA Rule 13514(a)-(c) provides:

"13514. Prehearing Exchange of Documents and Witness Lists, and Explained Decision Requests

"(a) Documents and Other Materials

"At least 20 days before the first scheduled hearing date, all parties must provide all other parties with copies of all documents and other materials in their possession or control that they intend to use at the hearing that have not already been produced. The parties should not file the documents with the Director or the arbitrators before the hearing.

"(b) Witness Lists

"At least 20 days before the first scheduled hearing date, all parties must provide each other party with the names and business affiliations of all witnesses they intend to present at the hearing. At the same time, all parties must file their witness lists with the Director, with enough copies for each arbitrator.

"(c) Exclusion of Documents or Witnesses

"Parties may not present any documents or other materials not produced and or any witnesses not identified in accordance with this rule at the hearing, unless the panel determines that good cause exists for the failure to produce the document or identify the witness. Good cause includes the need to use documents or call witnesses for rebuttal or impeachment purposes based on developments during the hearing. Documents and lists of witnesses in defense of a claim are not considered rebuttal or impeachment information and, therefore, must be exchanged by the parties."

There is no claim that the documents and witnesses Wedbush attempted to introduce pertaining to its recent investigation into "trading irregularities" involving

14

Kelleher's group had been timely disclosed under this rule. Nor does Wedbush claim that the Panel lacked the authority to exclude this evidence because of its late disclosure. Indeed, in addition to its authority to issue discovery sanctions under FINRA Rule 13511, FINRA Rule 13212, provides:

"Sanctions

"(a) The panel may sanction a party for failure to comply with any provision in the Code, or any order of the panel or single arbitrator authorized to act on behalf of the panel. Unless prohibited by applicable law, sanctions may include, but are not limited to:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Precluding a party from presenting evidence . . . ."

Once again, Wedbush has failed to cite any legal authority supporting its view that the Panel's decision to exclude its late proffered evidence under FINRA Rule 13212 is reviewable by a court upon a motion to confirm an arbitration award. For that reason, we reject the claim of error. Moreover, even assuming the Panel's exclusion of Wedbush's untimely proffer of evidence is reviewable, we conclude that its decision was fully justified by the circumstances, as we outlined above in connection with this challenge to the exclusion of that evidence as a discovery sanction under FINRA Rule 13511.

**D. No Error in Refusing to Vacate Arbitration Award Based on Arbitrator's Failure to Disclose**

Wedbush's last claim of error is the refusal to set aside the arbitration award based on an alleged failure of disclosure by one of the arbitrators, Walter P. Hitchcock (Hitchcock). Wedbush claims Hitchcock was required to disclose facts related to three legal malpractice lawsuits which named him as a defendant, and which were filed in the early 1990's. In support of its motion to vacate the arbitration award, Wedbush filed a second request for judicial notice, submitting the complaints related to each lawsuit. The complaints reveal the following pertinent information:

1. *Valle v. Chin et al.*, Case No. 931277, filed in San Francisco Superior Court on April 19, 1991. This suit was filed by the plaintiff, Ana Valle, against Hitchcock and another attorney, Arnold Chin, who allegedly were retained by the plaintiff in 1985 to file

15

a legal malpractice suit against Valle's former attorney, Bruce Pritzger. Due to the alleged negligence of the defendants, the action against Pritzger was dismissed for failure to prosecute. Attached to the complaint against Hitchcock and Chin is a copy of the complaint filed against Pritzger. Although both Hitchcock and Chin are listed as counsel of record, the complaint against Pritzger is signed by Chin alone.

The *Valle* complaint also alleges that Hitchcock and Chin represented Valle in two other lawsuits filed in Glenn and San Francisco counties seeking to perfect her interest in certain parcels of property located in those counties. In the Glenn County case, the defendant allegedly obtained a summary judgment, while in the San Francisco County action, plaintiff was required to terminate Hitchcock and Chin as her attorneys, and to hire new counsel.

2. *George Grover v. Chin et al.*, Case No. 942752, filed in San Francisco Superior Court on May 8, 1992. Plaintiff Grover alleged that the defendants had been retained in 1988 to represent him in connection with a personal injury action, which suit was ultimately dismissed for failure to prosecute. The legal malpractice suit names both Chin and Hitchcock individually as defendants, as well as their firm, Hitchcock & Chin.

3. *Intergraph Environmental Planning & Design, Inc. et al. v. Chin & Hitchcock et al.*, Case No. 942874, filed in San Francisco Superior Court on May 13, 1992. This action alleged that defendants had been retained by George J. Grover, Jr. in 1989 to represent him in connection with a legal malpractice action against another attorney. As a result of the negligence of the defendants in failing to file for a trial de novo after arbitration, Grover alleged that the value of his malpractice action was reduced to an amount "far below its true worth." Attachment 3c to this complaint is an allegation asserting that "each defendant was the agent, servant, joint venturer, partner, employee, alter-ego and co-conspirator of the other . . . ."

Wedbush argues that the failure to disclose Hitchcock's involvement in these three lawsuits some 20 years before the Kelleher arbitration violated both California law and FINRA rules governing arbitrator disclosures, and requires that the award be set aside,

16

pursuant to Code of Civil Procedure section 1286.2.  The pertinent portion of that section provides:

"(a) Subject to Section 1286.4, the court shall vacate the award if the court determines any of the following:

"(6) An arbitrator making the award either: (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware, . . ."  (Code Civ. Proc., § 1286.2, subd. (a)(6).)

Under California law, Wedbush contends that Hitchcock was required to disclose his involvement in these three lawsuits pursuant to Code of Civil Procedure section 1281.9, subdivision (a), which mandates:

"(a) In any arbitration pursuant to an arbitration agreement, when a person is to serve as a neutral arbitrator, the proposed neutral arbitrator shall disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial, including all of the following:

"(1) The existence of any ground specified in Section 170.1 for disqualification of a judge. . . ."  (Code Civ. Proc., § 1281.9, subd. (a)(1).)

According to Wedbush, Hitchcock's status as a defendant in these three lawsuits constitute matters which would cause a person becoming aware of their existence to reasonably entertain a doubt as to Hitchcock's ability to be impartial with regard to the Kelleher arbitration.  Both sides agree that the principle case authority interpreting the scope of this provision as applied to arbitrators is the recent California Supreme Court opinion in *Haworth v. Superior Court* (2010) 50 Cal.4th 372 (*Haworth*).

In *Haworth*, the arbitration in question involved alleged medical malpractice against a plastic surgeon who performed cosmetic lip surgery on a female patient.  Like this case, the alleged failure to disclose involved one of the three-member arbitration panel.  The patient who lost the arbitration in a 2-1 decision contended that the arbitrator failed to disclose that while he was still a superior court judge, he had been censured by the Supreme Court for making sexually suggestive remarks and conduct directed at female staff members.  The misconduct occurred some 15 years before the current

17

arbitration.  The contention was that knowledge of this earlier censure would cause a person becoming aware of it to reasonably entertain a doubt as to the arbitrator's ability to be impartial in deciding a dispute between a female and her physician arising out of cosmetic surgery.  Thus, it violated Code of Civil Procedure section 1281.9, subdivision (a), not to make the disclosure, and the award must be vacated.  (*Haworth*, *supra*, 50 Cal.4th at pp. 378-380.)

The Supreme Court disagreed that the censure, including the facts leading up to the censure, fell within the mandatory disclosure requirement of Code of Civil Procedure section 1281.9, subdivision (a).  First, in parsing the language of the section, the high court noted that courts interpreting the appearance of partiality standard have been cautious not to be over-inclusive:

"In interpreting a comparable provision of the federal law requiring recusal of a judge when his or her 'impartiality might reasonably be questioned' (28 U.S.C. § 455(a)), federal courts have stated that the appearance-of-partiality 'standard "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." ' [Citations.] ' "The 'reasonable person" is not someone who is "hypersensitive or unduly suspicious," but rather is a "well-informed, thoughtful observer." ' [Citations.]  '[T]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the disinterested objective observer whose doubts concerning the judge's impartiality provide the governing standard.' [Citations.]" (*Haworth*, *supra*, 50 Cal.4th at p. 389, italics omitted.)

Using this standard, as clarified, the *Haworth* court rejected the argument that the censure would cause a person to reasonably conclude the arbitrator might be biased against a female plaintiff in a medical malpractice case involving cosmetic surgery. (*Haworth*, *supra*, 50 Cal.4th at p. 389.)  Highlighting the importance of a subject matter link between the current arbitration and the matter subject to disclosure, the court found the public censure "simply provides no reasonable basis for a belief that [the former

18

judge] would be inclined to favor one party over the other in the present proceedings." (*Id.* at p. 391.)

While noting the roles of arbitrators may differ in some respects from the duties of judges, the court rejected the contention that the rules for disclosure for arbitrators should be broader than those governing recusal of judicial officers. (*Haworth*, *supra*, 50 Cal.4th at pp. 392-393.) The court went on to caution that an arbitrator "cannot reasonably be expected to identify and disclose all events in the arbitrator's past, including those not connected to the parties, the facts, or the issues in controversy, that conceivably might cause a party to prefer another arbitrator. Such a broad interpretation of the appearance-of-partiality rule could subject arbitration awards to after-the-fact attacks by losing parties searching for potential disqualifying information only after an adverse decision has been made. (*Remmey v. PaineWebber, Inc.* [(1994)] 32 F.3d [143,] 148 ['If this challenge were sustained, nothing would stop future parties to arbitration from obtaining allegedly disqualifying information, going through with the proceedings, and then coming forward with the information only if disappointed by the decision.'].) Such a result would undermine the finality of arbitrations without contributing to the fairness of arbitration proceedings." (*Haworth, supra*, 50 Cal.4th at pp. 394-395.)

Applying these clearly articulated criteria here, we have no hesitation concluding that Wedbush has failed to make a convincing argument that Hitchcock violated Code of Civil Procedure section 1281.9, subdivision (a), by not disclosing the three lawsuits in which he had been named a defendant two decades earlier. Wedbush has failed to sufficiently address why these three legal malpractice lawsuits were matters that could create a reasonable belief that the arbitrator " 'was biased *for or against a party for a particular reason.*' [Citation.]" (*Haworth*, *supra*, 50 Cal.4th at p. 389, original italics.) Nothing we can see would indicate that the lawsuits had anything to do with the securities industry or the parties, and we can divine no reason that being named a defendant in a legal malpractice case would predispose Hitchcock to favor Kelleher or disfavor Wedbush in the arbitration over unpaid compensation. Accordingly, Wedbush

19

has failed to satisfy its burden of showing that Hitchcock had a duty to disclose these lawsuits under Code of Civil Procedure section 1281.9, subdivision (a).

Alternatively, Wedbush contends that Hitchcock had a concomitant duty to disclose these prior lawsuits under FINRA rules as well. It points to FINRA Rule 13408, which requires the disclosure of "any circumstances which might preclude the arbitrator from rendering an objective and impartial determination . . . ." Turning to FINRA's "ARBITRATOR DISCLOSURE CHECKLIST" (Checklist), Wedbush refers to question No. 19 on that form which asks: "Has your conduct been an issue in an arbitration or litigation proceeding (other than a proceeding in which you served as an arbitrator)?" From this, Wedbush argues that because the Checklist included the question about prior "conduct," that information necessarily is of a nature that "might preclude the arbitrator from rendering an objective and impartial determination."

We disagree with Wedbush's syllogism. Wedbush's underlying assumption is that each question on the FINRA Checklist relates to a disqualifying event or circumstance under FINRA Rule 13408. But, this conclusion is incorrect. FINRA's "Dispute Resolution Arbitrator's Guide" includes several sections dealing with arbitrator disclosures and disqualifications. It includes the declaration that "[n]ot every disclosure results in the arbitrator being removed from service on a case."

The Checklist, which every potential arbitrator is required to submit with his or her respective "Oath of Arbitrator," includes 33 separate questions. Hitchcock indicated that he had no disclosures to make and marked each question in the "No" column. Many, but certainly not all, questions relate to the arbitrator's experience, and that of his or her family members, in the securities field. Question No. 19 asks:

"19. Has your conduct been an issue in an arbitration or litigation proceeding (other than a proceeding in which you served as an arbitrator)? For example, if your conduct as a registered representative or manager was an issue in a case, but only the broker-dealer was named as a party, your response should be 'yes'."

A fair reading of this section in context supports the conclusion that the scope of the question is limited to one's previous questioned "conduct" in the securities field.

20

Indeed, if it can be read as broadly as Wedbush argues, it would encompass all types of purely personal matters, such as previous family law disputes, that have no relevance to one's ability to serve as an arbitrator in a FINRA dispute. Therefore, Hitchcock was not required to disclose the three lawsuits in which he was named as a defendant, because they fell outside the scope of question No. 19, or otherwise were irrelevant to the question of whether Hitchcock might conceivably be biased or lack impartiality to sit as an arbitrator. Certainly, it was not a disqualifying event requiring that the arbitration award be vacated.

Indeed, FINRA Rule 13408(a), which governs disclosures, lends weight to this conclusion. It requires the disclosure of "any circumstances which might preclude the arbitrator from rendering an objective and impartial determination in the proceeding, including:

"(1) Any direct or indirect financial or personal interest in the outcome of the arbitration;

"(2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances with any party, any party's representative, or anyone who the arbitrator is told may be a witness in the proceeding, that are likely to affect impartiality or might reasonably create an appearance of partiality or bias;

"(3) Any such relationship or circumstances involving members of the arbitrator's family or the arbitrator's current employers, partners, or business associates; and

"(4) Any existing or past service as a mediator for any of the parties in the case for which the arbitrator has been selected."

Thus, while the rule does not make these four enumerated categories exclusive, together they encompass the following general subjects: (a) any interest that might be affected by the outcome; (b) relationships with any person or party involved in the proceeding; (c) relationships by the arbitrator's family or employer with anyone involved in the proceeding; and (d) past service as a mediator for anyone involved. Being named a party in a civil lawsuit such as those Wedbush describes fits into none of these categories. Accordingly, Wedbush has not convinced us that question No. 19 was intended to be so

21

broad as to encompass the prior actions, and that the failure by Hitchcock to disclose them in answer to question No. 19 was a disqualifying omission in any event.

## IV.

## DISPOSITION

The orders of the trial court denying Wedbush's motion to vacate the arbitration award, and granting Kelleher's motion to confirm the award, are affirmed. Costs on appeal are awarded to Kelleher.

_____
RUVOLO, P. J.

We concur:

_____
REARDON, J.

_____
HUMES, J.

22